[File No. Cr. 184.]

STATE OF NORTH DAKOTA, Respondent, v. O. G. CROMWELL, Appellant.

(9 NW(2d) 914)

Opinion filed June 5, 1943.

*Clyde L. Young,* for appellant.

567

*Alvin Strutz,* Attorney General, *George S. Register,* Special Assistant Attorney General, and *Floyd B. Sperry,* State's Attorney, for respondent.

NUESSLE, J. The state's attorney of Mercer county filed an Information in the district court of that county charging the defendant Cromwell with the offense of attempting to practice photography without a license, contrary to the provisions of chap. 188, Session Laws 1939. This Information charged: ". . . said defendant then being in the act of taking and producing, for compensation, through the sale thereof, images on sensitized material by the action of light, and with the use of a camera, said defendant having in his possession at said time, a camera with said sensitized materials, which said defendant was then operating for said purpose, and with which the defendant had taken three exposures, the defendant not being licensed pursuant to said Act, at said time, as required by the provisions thereof. . . ."

Appellant was duly arraigned. He demurred to the Information on

the ground that the statute in question was unconstitutional and therefore void. The court overruled the demurrer. Thereupon appellant entered a plea of guilty. He at once moved the court in arrest of judgment on the ground that the facts stated in the Information did not constitute a public offense for the reason that chap. 188, Session Laws 1939, the act on which the charge was predicated, was unconstitutional and void in that it violated § 1 of the Fourteenth Amendment to the Constitution of the United States and §§ 1, 13 and 20 of the Constitution of the state of North Dakota. The court denied the motion in arrest and pronounced judgment that appellant be fined and imprisoned pursuant to the penalty provision of said chapter 188. Judgment was entered accordingly and appellant perfected the instant appeal from the order denying his motion in arrest and from the judgment of conviction.

Chapter 188, Session Laws 1939 is entitled: "An act to create a State board of photographic examiners and to regulate the practice of professional photography and to provide for licensing and registration of persons engaged in the practice of professional photography and to protect the public from fraud practiced by unscrupulous and irresponsible persons through misrepresentation and other unconscionable artifices and the obtaining of the possession of property without returning value therefor and for the protection of the public health and safety; providing for the enforcement of the provisions of this act and for the punishment for violation thereof."

The act consists of fifteen sections. It first defines the practice of professional photography as "the profession or occupation of production for compensation of images on sensitized materials by the action of light and with the use of a camera; development and fixation of the latent image to render same visible and permanent, and/or the subsequent reproduction or transfer of such image, either negative or positive, upon other sensitized material by the aid of light and chemical action." It then specifies the exceptions to the application of the act and the individuals exempted from its operation. It creates a board of examiners, consisting of five members to be appointed by the governor, all of whom must be photographers who have been engaged in the business in the state for not less than four consecutive years. It provides

that the board shall have authority to examine applicants who desire to practice photography within the state and to issue certificates of registration and license to practice photography to such as qualify as to competence, ability and integrity. In giving examinations "the board may take testimony under oath . . . as to technical qualifications or the business record of the applicant, and the board shall grant or refuse a license to practice to the applicant in accordance with the provisions of § 8 hereof." Section 8 provides: "Every person desiring to commence the practice of photography in this State after this act takes effect, shall file an application, under his true name, for a license so to practice, together with an examination fee of twenty-five dollars ($25.00) with the secretary of the board. He shall appear before the board for examination within one year, and present such references and credentials as the board may require, and shall give satisfactory evidence as to competence and fitness to practice photography, based on technical knowledge and business integrity."

If the applicant successfully passes the examination he shall be registered by the board as a qualified photographer and receive a license authorizing him to practice photography. Such license shall not be transferable. Section 10 provides for the payment of annual fees by those licensed. Section 11 provides: "The board (after hearing) shall have power to revoke the license of any photographer who, in the opinion of the board, is guilty of fraudulent practices, or of willful misrepresentations, or for professional inactivity within the State for a period of one (1) year, unless given further time by the board, or who is convicted of a crime involving moral turpitude. . . ."

The act further provides that a person shall be regarded as a practicing photographer who is a manager, proprietor, or conductor of a place in which photographs are made and offered for sale or who is an employee therein within the meaning of the act and penalizes as for a misdemeanor any individual, copartnership, association, or corporation engaged or attempting to engage in the practice of professional photography or acting in the capacity of a professional photographer either as manager, proprietor or conductor of a photographic establishment or an employee therein within the meaning of the act without first having complied with its provisions or whose license shall have been revoked

or suspended or who shall violate any provisions of the act, and fixes the penalty of fine or imprisonment or both. In short, the act requires that those who would engage in the business of photography must procure a license or, failing to do so be subject to prosecution as for a misdemeanor; such license to be granted only after an examination by the board created by the act touching the competence and fitness of the applicant to practice photography based on technical knowledge and business integrity.

Appellant contended in the lower court, as he now does here in support of his appeal, that the legislative assembly has no constitutional power to exclude from the practice of photography for profit those persons who do not submit to an examination by the state board of photographic examiners and otherwise comply with the provisions of the act. In that behalf he contends that the business of photography is one of the ordinary occupations of life and that the right of every citizen regardless of education or other personal qualifications to engage in such an occupation is guaranteed to him by § 1 of the Constitution of North Dakota, which declares that all men are by nature equally free and independent and have certain inalienable rights, among which are those of enjoying and defending life and liberty and acquiring, possessing and protecting property and reputation and pursuing and obtaining safety and happiness; and by § 13 of the Constitution of North Dakota which provides that no person shall be deprived of life, liberty or property without due process of law; and by § 20 of the Constitution which provides: "No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

He further contends that the right to engage in such an occupation is likewise guaranteed against encroachment by the states by § 1 of the Fourteenth Amendment to the Constitution of the United States, which provides that no state shall make or enforce any law which shall deprive any person of life, liberty, or property without due process of law, and that no state shall make or enforce any law which shall deny to any person within its jurisdiction equal protection of the laws or

make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.

On the other hand, the state maintains that photography is at least an art, if not a science; that its proper practice requires scientific knowledge, skill, and training; that it approaches, if it does not attain, the dignity of a profession and has been so recognized and designated by legislative enactment; that the relationship between a photographer and his customer is confidential; that it affords opportunity for fraud and so personal integrity and business responsibility is required of those who practice it; that generally the business so affects the public welfare that it is subject to regulation and accordingly chap. 188 is a valid and constitutional enactment in the exercise of the police power. There is no contention that the statute is other than a regulatory measure.

Summed up, appellant's contention is that photography is one of the ordinary occupations of life, innocent and innocuous, and, as such, his right to engage in it as a means of livelihood, free from the requirements and restrictions imposed by chap. 188, is insured to him by those provisions of the state and Federal Constitutions on which he relies; the state's contention is that the business is so pregnant with possibilities affecting and inimical to the public interest and general welfare, that the state, exercising the police power, may constitutionally impose the requirements and restrictions contained in the statute. So the only question for our determination is as to whether chap. 188 is vulnerable to appellant's challenge of constitutionality.

Presumptively, the statute is a valid enactment and the burden is on the appellant to show that it is not. "Every reasonable presumption is in favor of the constitutionality of a statute enacted by the legislature. 8 Cyc 801; O'Laughlin v. Carlson, 30 ND 213, 152 NW 675. This presumption is conclusive, unless it is clearly shown that the enactment is prohibited by the Constitution of the state or of the United States. Cooley, Const. Limitations, 7th ed. 242; 8 Cyc 801. The only test of the validity of an act regularly passed by a state legislature is whether it violates any of the express or implied restrictions of the state or Federal Constitutions." State ex rel. Linde v. Taylor, 33 ND 76, 156 NW 561, LRA1918B 156, Ann Cas 1918A 583. See also State ex

rel. Sathre v. Board of University, 65 ND 687, 262 NW 60; State v. First State Bank, 52 ND 231, 202 NW 391.

Of course, if the challenge is sustained on any one of the grounds advanced, we must so declare and it will not be necessary to consider the remaining grounds. We will first examine the contention that the statute violates § 1 and the due process clause of § 13 of the Constitution of North Dakota. We will consider these two sections together because the second supplements and supports the first which defines and declares the inherent rights of men, while the second protects and guarantees the exercise and enjoyment of those rights. Thus it follows that there cannot be a violation of § 1 unless there be also a violation of § 13. We quote § 1 again: "All men are by nature equally free and independent and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property and reputation; and pursuing and obtaining safety and happiness."

This section embodies the essence of the statement of the "self-evident truths" set forth in the Declaration of Independence, and the words and terms used, whether in the Declaration of Independence, the Constitution of the United States, or the Constitutions of the several states, convey a commonly accepted meaning. Thus liberty "includes the right of the citizen to be free to use his faculties in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or vocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out these purposes to a successful conclusion. Within the meaning of the term 'liberty' is also included the right to buy and sell, to select freely such tradesmen as the citizen himself may desire to patronize, to manufacture, to acquire property, to live in a community, to have a free and open market, the right of free speech, of self-defense against unlawful violence, and, in general, the opportunity to do those things which are ordinarily done by free men." 11 Am Jur pp 1136 et seq., Constitutional Law, and authorities cited.

"The right to follow any of the common occupations of life is an inalienable right. That right is one of the blessings of liberty, and is accorded as a privilege to the citizens of the United States by the

preamble to the Federal Constitution, and by the Declaration of Independence under the language 'pursuit of happiness.' The right of a citizen to pursue ordinary trades or callings upon equal terms with all other persons similarly situated is a part of his right to liberty and property Bessette v. People, 193 Ill 334, 62 NE 215, 56 LRA 558; Allgeyer v. Louisiana, 165 US 578, 41 L ed 832, 17 S Ct 427; Powell v. Pennsylvania, 127 US 678, 32 L ed 253, 8 S Ct 992, 1257. 'Liberty' as used in the Constitution embraces the free use by all citizens of their powers and faculties subject only to the restraints necessary to secure the common welfare." Frazer v. Shelton, 320 Ill 253, 150 NE 696, 43 ALR 1086, p. 1093.

"This latter expression (the pursuit of happiness) is one of a general nature, and the right thus secured is not capable of specific definition or limitation, but is really the aggregate of many particular rights, some of which are enumerated in the constitutions, and others included in the general guarantee of 'liberty.' The happiness of men may consist in many things or depend on many circumstances. But in so far as it is likely to be acted upon by the operations of government, it is clear that it must comprise personal freedom, exemption from oppression or invidious discrimination, the right to follow one's individual preference in the choice of an occupation and the application of his energies, liberty of conscience, and the right to enjoy the domestic relations and the privileges of the family and the home. The search for happiness is the mainspring of human activity. And a guaranteed constitutional right to pursue happiness can mean no less than the right to devote the mental and physical powers to the attainment of this end, without restriction or obstruction, in respect to any of the particulars thus mentioned, except in so far as may be necessary to secure the equal rights of others. Thus it appears that this guaranty, though one of the most indefinite, is also one of the most comprehensive to be found in the constitutions." Black, Constitutional Law, § 145. See also Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co. 111 US 746, 28 L ed 585, 4 S Ct 652.

The last clause of § 13 of the Constitution provides that "no person shall . . . be deprived of life, liberty or property without due process of law." Due process of law means "the law of the land;" that which

"secures the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." Bank of Columbia v. Okely, 4 Wheat. (US) 235, 4 L ed 559. See also State ex rel. Miller v. Taylor, 27 ND 77, 145 NW 425; Hurtado v. California, 110 US 516, 28 L ed 232, 4 S Ct 111, 292; 2 Cooley, Constitutional Limitations, 8th ed. pp. 733, et seq.; Black, Constitutional Law, §§ 151 et seq. Thus the due process clause protects and insures the use and enjoyment of the rights declared by § 1 of the Constitution.

The appellant insists that pursuant to the constitutional provisions considered above as they are generally construed and given effect, he has the right to carry on the business of photography as a means of livelihood without complying with the requirements of chap. 188, and that the provisions of that chapter which impose a license subject to qualification as to character, business integrity, knowledge and skill are unreasonable encroachments upon his rights as declared by § 1 of the Constitution and, therefore, the statute is unconstitutional and void. On the other hand, the State justifies these provisions as a proper exercise of the police power.

"The term 'police power' as understood in American constitutional law, means simply the power to impose such restrictions upon private rights as are practically necessary for the general welfare of all. Rippe v. Becker, 56 Minn 100, 57 NW 331, 22 LRA 857. And it must be confined to such restrictions and burdens as are thus necessary to promote the public welfare, or, in other words, to prevent the infliction of public injury. State v. Chicago G. W. R. Co. 68 Minn 381, 71 NW 400, 38 LRA 672, 64 Am St Rep 482. And in the exercise of its police powers a state is not confined to matters relating strictly to the public health, morals, and peace, but, as has been said, there may be interference whenever the public interests demand it; and in this particular a large discretion is necessarily vested in the legislature, to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. Lawton v. Steele, 152 US 133, 38 L ed 1076, 14 S Ct 499. If, then, any business becomes of such a character as to be sufficiently affected with public interest, there may be a legislative interference and regulation of it in order to secure the

general comfort, health, and prosperity of the state, provided the measures adopted do not conflict with constitutional provisions, and have some relation to, and some tendency to accomplish, the desired end. The subjects which may be legislated upon are of necessity continually arising as business increases, and new phases, conditions, and methods appear. The development of the law relating to the proper exercise of the police power of the state clearly demonstrates that it is very broad and comprehensive, and is exercised to promote the general welfare of the state, as well as its health and comfort. And the limit of this power cannot and never will be accurately defined, and the courts have never been willing, if able, to circumscribe it with any definiteness." State ex rel. Beek v. Wagener, 77 Minn 483, 80 NW 633, 778, 1134, 46 LRA 442, 77 Am St Rep 681. And this court, considering the police power, has said that it is " 'the power inherent in every sovereignty . . . the power to govern men and things'—under which power, the legislature may, within constitutional limitations, not only prohibit all things hurtful to the comfort, safety, and welfare of society, but prescribe regulations to promote the public health, morals, and safety, and add to the general public convenience, prosperity, and welfare." State ex rel. Linde v. Taylor, 33 ND 76, 156 NW 561, LRA1918B 156, supra. It is not limited to regulations necessary for the preservation of good order or the public health and safety but the prevention of fraud and deceit, cheating, unfair competition, and imposition are equally within the power. State v. Armour & Co. 27 ND 177, 145 NW 1033, LRA1916E 380, Ann Cas 1916B 1149; Cofman v. Ousterhous, 40 ND 390, 168 NW 826, 18 ALR 219.

Every business to some extent, great or small, depending upon the circumstances, may affect the public welfare and accordingly may be subject to regulation to the extent permitted by the guaranties that are contained in the Constitutions of the several states and of the United States. Neer v. State Live Stock Sanitary Bd. 40 ND 340, 168 NW 601, 18 NCCA 1; New State Ice Co. v. Liebmann, 285 US 262, 76 L ed 747, 52 S Ct 371. The following quotation from the dissenting opinion of Mr. Justice Brandeis in the New State Ice Co. Case, supra, is particularly pertinent here: "A regulation valid for one kind of business may, of course, be invalid for another; since the reasonableness

of every regulation is dependent upon the relevant facts. . . . Whatever the nature of the business, whatever the scope or character of the regulation applied, the source of the power invoked is the same. And likewise the constitutional limitation upon that power. The source is the police power. The limitation is that set by the due process clause, which, as construed, requires that the regulation shall not be unreasonable, arbitrary, or capricious; and that the means of regulation selected shall have a real or substantial relation to the object sought to be obtained. . . . In my opinion, the true principle is that the state's power extends to every regulation of any business reasonably required and appropriate for the public protection. I find in the due process clause no other limitation upon the character or the scope of regulation permissible."

But the power to regulate a business does not necessarily include the power to exclude persons from engaging in it. State v. Harris, 216 NC 746, 6 SE(2d) 854, 128 ALR 658, and cases cited. . . . The right of a citizen to pursue any of the ordinary vocations, on his own property and with his own means, can neither be denied nor unduly abridged by the legislature, for the preservation of such right is the principal purpose of the Constitution itself. In such cases, the limit of legislative power is regulation, and that power must be cautiously and sparingly exercised, unless the business is of such character as places it within the category of social and economic ills. Such pursuits as agriculture, merchandising, manufacturing and industrial trades cannot be dealt with at will by the legislature. As to them, the power of regulation is comparatively slight when they are conducted and carried on upon private property and with private means." 2 Cooley, Constitutional Lim. 8th. ed. p. 1329, citing Ex parte Dickey, 76 W Va 576, 85 SE 781, LRA1915F 840, PUR1915E 93, and Northwestern Nat. Ins. Co. v. Fishback, 130 Wash 490, 228 P 516, 36 ALR 1507.

Whether and in what manner a business shall be regulated are matters of policy for the legislative department of government to determine. State v. Armour & Co. 27 ND 177, 145 NW 1033, LRA1916E 380, Ann Cas 1916B 1149, supra. And the wisdom, necessity and expediency of legislation are matters for legislative and not judicial con-

sideration. State ex rel. Linde v. Taylor, 33 ND 76, 156 NW 561, LRA 1918B 156, supra; Federal Farm Mortg. Corp. v. Falk, 67 ND 154, 270 NW 885, 113 ALR 724. But, as we have said above, a regulatory statute enacted in the exercise of the police power must be reasonable. Its real purpose must be to protect the public health, morals or general welfare, and it must be reasonably required and suited to attain that purpose. It cannot masquerade as an exercise of the police power and arbitrarily invade personal rights or private property. It cannot disregard the constitutional guaranties. And, whether it does so, is a question for the courts to determine. State v. Armour & Co. supra; Re Jacobs, 98 NY 98, 50 Am Rep 636; People v. Ringe, 197 NY 143, 90 NE 451, 27 LRA(NS) 528, 18 Ann Cas 474; Black, Constitutional Law, p. 325. In doing this "The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." Mugler v. Kansas, 123 US 623, 31 L ed 205, 8 S Ct 273. See also the dissenting opinion of Judge Fisk in State v. Armour & Co. 27 ND 177, 145 NW 1033, LRA1917E 380, Ann Cas 1916B 1149, supra, and the authorities cited therein.

Turning now to the statute, chap. 188, supra, and viewing it in the light of the foregoing principles, can it be said that the business of photography is of such a character as to warrant the restraints imposed by the statute for the protection of the public? Are the means of regulation contained therein reasonably required and appropriate for that purpose? We do not think so.

It is urged that many other occupations are subjected to the requirements of regulatory laws. This is unquestionably the case. But this argument is entitled to little weight. There is a wide distinction between those statutes which, in regulating a business or occupation,

impose restrictions that have the effect of denying or unreasonably curtailing the right to engage in them as does chap. 188, and those which regulate without imposing such restrictions. And the State fails to note this distinction.

The reasonableness of every regulation is dependent upon the relevant facts. It is true, as this court said in Voss v. Gray, 70 ND 727, 298 NW 1, that a successful photographer must in the carrying on of his business possess and exercise artistic talent and skill and that the relation between him and his customer who contracts to have his photograph taken and finished is a confidential one in that there is implied in the contract of employment an agreement that no photographs thus taken and finished may be sold and delivered for any purpose to any other person than the one who makes the contract without the latter's consent. Even so, how does this justify the exclusion from the business of those who are not of such moral fiber or do not possess such learning, talent and skill as a board of examiners may think requisite. Why is the business of photography any more charged with the possibility of harm to the public or to any individual than is any other of the ordinary occupations in which men engage. After all, the portrayal of subjects, animate or inanimate, is not new. It has been done since that remote time when Ab the caveman scratched his crude drawings of the saber-toothed tiger and the mastodon on the rock walls of his primitive dwelling. And modern man, aided by chemistry and physics merely has so mechanized the process during the last hundred years as to make it possible for a much larger proportion of his fellows to make use of it and called it photography. So far as knowledge, training and skill are concerned, whether acquired from books or through practice and experience, it cannot be gainsaid that they are required by the farmer, the storekeeper, the carpenter, the machinist, the tailor, the actor, the musician—in fact by every individual successfully engaged in a definitely specialized occupation, be it called a trade, a business, an art or a profession. And there is as much ground for requiring a mental and moral examination preliminary to licensing those who may engage in any of these occupations as there is for those who engage in the business of photography, yet, who would maintain that such a requirement would be reasonable? Nor does it seem to us that photography affords such

peculiar opportunities for fraud as to require the safeguards purportedly provided by this regulatory statute. We cannot see why there is greater opportunity in this business to defraud the individual or the public generally than there is in any of the other ordinary occupations. Every occupation affords some opportunity for fraud, yet, on that account, should no one be permitted to engage in any business or occupation unless his good character, his ability, his learning and his skill first have been shown by examination to the satisfaction of a board composed of those who will be his competitors if he is licensed by them? Other arguments are advanced in support of the State's contention that the regulations prescribed in the act are proper and necessary for the protection of the public, but they are even more fanciful and less forceful than those we have considered above.

What we have said regarding the statute is, of course, no reflection upon the legislature which enacted it. Beyond question the legislative motive and purpose were good. But it is a matter of common knowledge that pressure groups are frequently able to bring about legislative action they believe will be to their advantage by their argument that it is needed for the protection of the public. And such is nothing new. The like happened when Paul preached in Ephesus. See Acts XIX: 23–28, inclusive, where it is said: "And the same time there arose no small stir about that way. For a certain man named Demetrius, a silversmith, which made silver shrines for Diana, brought no small gain unto the craftsmen; Whom he called together with the workmen of like occupation, and said, Sirs, ye know that by this craft we have our wealth. Moreover ye see and hear, that not alone at Ephesus, but almost throughout all Asia, this Paul hath persuaded and turned away much people, saying that they be no gods, which are made with hands; So that not only this our craft is in danger to be set at nought; but also that the temple of the great goddess Diana should be despised, and her magnificence should be destroyed, whom all Asia and the world worshippeth. And when they heard these sayings, they were full of wrath, and cried out, saying, 'Great is Diana of the Ephesians.' "

Statutes identical with or similar to chap. 188 have been enacted in other jurisdictions and with one exception when tested in the courts have been held bad as in violation of constitutional rights. See Buehman

v. Bechtel, 57 Ariz 363, 114 P(2d) 227, 134 ALR 1374; Bramley v. State, 187 Ga 826, 2 SE(2d) 647; Territory v. Kraft, 33 Haw 397; Wright v. Wiles, 173 Tenn 334, 117 SW(2d) 736, 119 ALR 456. The single exception is State v. Lawrence, 213 NC 674, 197 SE 586, 116 ALR 1366, writ of certiorari denied in 305 US 638, 83 L ed 411, 59 S Ct 105, where the statute was sustained by a divided court, two of the five judges dissenting. Subsequently, in State v. Harris, 216 NC 746, 6 SE(2d) 854, 128 ALR 658, supra, the North Carolina court in effect receded from much that was said in the Lawrence Case, in an opinion written by Judge Seawell, one of the dissenting judges in the latter case.

Accordingly, we hold chap. 188, Session Laws 1939, unreasonably curtails the right to engage in the business of photography and so violates §§ 1 and 13 of the Constitution of the state of North Dakota. So holding it is not necessary to pass upon the other challenges to the statute's validity and we refrain from doing so. The order and judgment appealed from are reversed and the case is remanded for further proceedings in accordance with this opinion.

BURKE, MORRIS, CHRISTIANSON, and BURR, JJ., concur.