**FAIRMONT FOODS COMPANY, Plaintiff and Respondent,**

v.

**Leslie R. BURGUM, Attorney General of the State of North Dakota, and Harold L. Anderson, State's Attorney of Burleigh County, North Dakota, Defendants and Appellants.**

No. 7597.

Supreme Court of North Dakota.

Feb. 21, 1957.

Leslie R. Burgum, Atty. Gen., A. C. Bakken, Jr., First Asst. Atty. Gen., John Hjellum, Sp. Asst. Atty. Gen., for appellants.

Hyland & Conmy, Bismarck, Flansburg & Flansburg, Lincoln, Neb., for respondents.

SATHRE, Judge.

The plaintiff brings this action for a declaratory judgment declaring Chapter 303 of the Session Laws of 1955 of North Dakota unconstitutional and void and for a restraining order or temporary injunction enjoining the defendants from taking any steps or instituting any action or bringing any proceedings of any kind for the enforcement of said Chapter 303 until the final determination of this action. An order to show cause was served on the defendants why such temporary injunction should not be issued and at such hearing an injunction pendente lite was issued by the trial court.

When the temporary injunction was issued it was agreed by the parties that the defendants demur to plaintiff's complaint and that the issues be submitted to the trial court on briefs. The trial court overruled the demurrer. The defendants did not answer but elected to stand on their demurrer, and the trial court rendered judgment holding said Chapter 303 to be un-

constitutional and void. From this judgment the defendants have appealed to this court and demand a trial de novo.

The Statute challenged is as follows:

"An Act

"Relating to unfair trade practices in the dairy industry.
"Be It Enacted by the Legislative Assembly of the State of North Dakota:

"§ 1.  Unfair Trade Practices in the Dairy Industry.

"1.  As used in this section the term 'dairy products' includes milk, cream, butter, cheese, cheese food, ice cream, frozen desserts, ice milk, sherbet, and any other edible products manufactured or processed which has any of such products as its principal ingredients.

"2.  Each of the practices described in this subsection is declared to be an unfair trade practice. It shall be unlawful for any person to be engaged in such practices. No person who is a dealer in or a vendor of dairy products, for sale to a retailer or who sells dairy products to any person for retail sales shall:

"a.  Give or extend discounts on dairy products sold to retail outlets, except for standard printed public discounts which fairly represents costs savings which may be passed on to the consumer.

"b.  Furnish, give, lend, sell, or rent any advertising materials or matter except materials or matter advertising the vendor's own products, providing that not more than one-third of the space or .cost in the advertising material or matter be used to identify the retailer.

"c.  Make payments of money, credit, gifts, or loans to retail outlets as rental for the storage or display of dairy products on the premises where they are offered for sale.

"d. Loan or underwrite loans except that vendors can help retailers buy dairy refrigeration, storage, display and selling equipment, when the loan is for no more than ninety percent of the purchase price, secured by a chattel mortgage bearing five percent interest rate and payable in not more than thirty-six months.

"e. Furnish, sell, give, lend, or rent any equipment to a retail outlet. Except that a vendor may sell for cash or terms as heretofore explained under subsection (d), dairy refrigeration display and storage equipment, the selling price of which shall be the cost to the vendor plus at least ten percent to cover transportation and installation costs, less one percent per month depreciation but in no event shall it be less than fifty dollars per unit. Subsection (e) shall not apply to coin vending machines where the product vended is consumed on the premises.

"f. Maintain or make repairs of any equipment owned by a retail outlet, except that used exclusively for dairy products, charging comparative, competitive commercial fees and charges for the service and parts.

"g. Extend or give credit to any retail outlet in excess of thirty days payable fifteen days thereafter.

"h. Give any gift of money, merchandise, services or materials of any value to any retail outlet, except bona fide charities, except such services heretofore specifically permitted.

"3. Nothing in this section shall be interpreted to prohibit the operation of a retail outlet by a person who is also a dealer in or a vendor of retail products for sale to a retailer or for retail sales or to prohibit the use by him in such retail outlet any equipment or advertising or miscellaneous matter owned by him provided that such retail outlet is under direct control and management of the dealer.

"4. Nothing in this section shall be interpreted to prohibit the giving away of merchandise to be consumed on the premises.

"5. For the purpose of this section any subsidiary or affiliate corporation, cooperative, officer, director or partner of a corporation, a cooperative, or partnership which is a dealer in or a vendor of dairy products shall be deemed to be a dealer in or vendor of dairy products.

"§ 2. All contracts and agreements made in violation of this Act shall be void. All contracts and arrangements in effect on the date this Act becomes effective and in violation of this Act shall be void within six months.

"§ 3. Any person who shall violate any of the provisions of this Act shall be guilty of a misdemeanor and shall be punished by a fine of not more than one hundred dollars or by imprisonment in the county jail for not more than thirty days, or by both such fine and imprisonment.

"§ 4. The attorney general shall be responsible for the enforcement of this Act. Prosecution of violators of this Act shall be under the supervision of the state's attorney of the county in which the violation occurred.

"Approved March 11, 1955."

The appellants contend that the trial court erred in holding said Chapter 303 unconstitutional. They argue that the practices prohibited by said Chapter are unfair; that they have a direct tendency to create a monopoly and to stifle competition; and that the inhibitions contained in the statute are reasonable regulations of unfair trade practices under the police power of the State.

The complaint of the plaintiff-respondent alleges that it is a foreign corporation and that it has complied with and is authorized

under the laws of the State of North Dakota to carry on business therein. The complaint alleges further that the Attorney General of the State of North Dakota and the State's Attorney of Burleigh County are expressly responsible for the enforcement of this Statute and this action is brought against them as officers of the State.

The complaint alleges further:

That the plaintiff is and has been for many years engaged in this State in the business of manufacturing, processing, selling, and distributing dairy products including milk, cream, butter, cheese, ice cream, frozen desserts, sherbets and other edible products having some of such articles in their principle ingredients.

That the plaintiff is extensively engaged in the manufacture, distribution and sale of its products to retail dealers scattered throughout the entire State of North Dakota including dealers in Burleigh County, North Dakota; that in carrying on its business throughout the State and in Burleigh County it engages in the following transactions, dealings, agreements and contracts with its retail dealer customers; in a large number of instances it has furnished and is furnishing to retail customers signs advertising plaintiff's products for such retail customers for display, on which in some cases the advertising material identifying the retail customer of his business covers less than one-third of the space or cost of such sign and in other cases more than one-third of the space or cost of the sign is devoted to advertising material and matter used to identify such retail customer; and that as to one character of sign or the other the plaintiff is clearly in violation of Section 1, subd. 2, subsec. b of the Act above referred to, but owing to the ambiguity in the wording of the Section plaintiff is unable to say as to which of such signs it is in violation.

That on occasions plaintiff makes loans of money to retail dealer customers, without the security of a chattel mortgage on dairy refrigeration, storage, display or selling equipment, at the plaintiff's customary rate of six per cent per annum, when the financial credit alone or security other than that prescribed by statute of such customer, in the judgment of the plaintiff, warrants such a loan, and that Section 1, subd. 2, subsec. d of the Act above referred to declares such loans illegal and denies the plaintiff the right to make any further loans without the security of such a chattel mortgage as is required by statute.

That at the present time it has existing a great number of contracts between itself and its retail dealer customers involving the various kinds of transactions described in the statute, and that all of such contracts and arrangements now in force are declared illegal and void by Section 2 of said Act, and that all contracts and agreements of similar character which plaintiff in the course of its business, would make in the future with its retail dealer customers are declared by Section 2 of said Statute to be illegal and void.

The complaint further alleges that said Chapter 303 is unconstitutional and void in that it is arbitrary and unreasonable, has no rational relation to the prevention of any offense or evil and is not in the interest of the public health, safety, morals, or welfare; that it deprives plaintiff of its liberty of contract, impairs the obligation of its existing contracts and deprives plaintiff of its property without due process of law all in violation of Section 13, Article 1 of the Constitution of the State of North Dakota providing that no person shall be deprived of life, liberty and property without due process of law; and in violation of Section 16, Article 1 of the Constitution of the State of North Dakota providing that no law impairing the obligation of contract shall ever be passed; and in violation of the 14th Amendment to the Constitution of the United States providing that no state shall deprive any person of life, liberty or property without due process of law or deny to any person the equal protection of the law.

The rule is well settled that one may not attack the constitutionality of a statute unless he can show that he is injured thereby. We quote the following from 16 C.J.S., Constitutional Law, § 76, pp. 234–235.

"One may attack the constitutionality of a statute only when and as far as it is being, or is about to be, applied to his disadvantage; and to raise the question he must show that the alleged unconstitutional feature of the statute injures him and so operates as to deprive him of a constitutional right."

And in the case of Asbury Hospital v. Cass County, 72 N.D. 359, at page 392, 7 N.W.2d 438, 456, this court held:

"It is an elementary rule repeatedly announced with practical unanimity by the courts of this country, including the Supreme Court of the United States and this Court, that a person can question the constitutionality of a statute only when and in so far as it is sought to be applied to his disadvantage."

The first question for consideration is whether or not the respondent is injuriously affected by the operation of the statute challenged. The appellants having elected to stand on their demurrer in this action thereby admit the truth of all facts well pleaded in the complaint. We are of the opinion that the complaint alleges facts which sufficiently show that the plaintiff-respondent has been injuriously affected in its business operations by the provisions of the statute challenged. The inquiry then follows whether the rights of the respondent thus affected are such as are protected by the constitutions of the State and of the United States.

The appellants in this case have not pointed out any vice or injurious consequence to the public resulting from the contracts or transactions of the respondent which would require preventive legislation under the police power of the state. They have not pointed to any practice by the respondents which would stifle competition or create a monopoly in the dairy industry. The trade practices prohibited by said Chapter 303 have been followed for many years in the past and the dairy industry has expanded and become an important economic factor in the state.

Respondent's complaint states that at the present time it has a great number of existing contracts between itself and retail dealer customers involving the various kinds of transactions described in the Statute all of which contracts are now in force; but under the provisions of Section 2, of said Chapter 303 are illegal and void.

Under Subdivision 2, Subsection d, of Section 1 of said Chapter 303 it is unlawful for a wholesaler to loan or underwrite loans to a retailer except that vendors may help retailers to buy dairy refrigeration, storage, display, and selling equipment, when the loan is for no more than ninety percent of the purchase price, secured by a chattel mortgage bearing interest at five percent and payable in not more than thirty-six months. Under the statute quoted the wholesaler is prohibited from extending credit without taking a chattel mortgage and is limited to a rate of interest less than the statutory contract rate. It would be illegal and in violation of said statute to extend credit for more than thirty-six months regardless of the financial ability of the retailer to whom such credit was extended.

Subdivision 2, Subsection g, Section 1 of said Chapter makes it illegal to:

"extend or give credit to any retail outlet in excess of thirty days payable fifteen days thereafter."

Subdivision 2, Subsection c, of said Statute makes it unlawful to:

"Make payments of money, credit, gifts, or loans to retail outlets as rental for the storage or display of dairy products on the premises where they are offered for sale."

The appellants argue that the dairy industry is affected with a public interest and that

the provisions of Chapter 303 are reasonable regulations of trade practices in the dairy industry under the police power of the State.

■ The general rule as to the enactment of legislation under the police power of the State is stated in 16 C.J.S., Constitutional Law, § 195, pp. 940–941–942 as follows:

"In order that a statute may be sustained as an exercise of the police power, the law must, in fact, be a police law, and the courts must be able to see that the enactment has for its object the prevention of some offense or manifest evil or the preservation of the public health, safety, morals, or general welfare, that there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable, and appropriate manner tend toward the accomplishment of the object for which the power is exercised."

"Determination by a legislature as to what constitutes a proper exercise of its police power is not final and conclusive, but is subject to supervision by the courts." Paramount Picture v. Langer, D.C., 23 F.Supp. 890, 896.

"The question in each case is whether the legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression or spoliation of a particular class." Holden v. Hardy, 169 U.S. 366, 398, 18 S.Ct. 383, 390, 42 L.Ed. 780.

"A state may not, under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them." Burns Baking Co. v. Bryan, 264 U.S. 504, 513, 44 S.Ct. 412, 413, 68 L.Ed. 813, 32 A.L.R. 661.

"If the means employed have no real, substantial relation to public objects which government may legally accomplish,—if they are arbitrary and unreasonable, beyond the necessities of the case,—the judiciary will disregard mere forms, and interfere for the protection of rights injuriously affected by such illegal action." Chicago, B. & Q. Ry. Co. v. Illinois, 200 U.S. 561, 593, 26 S.Ct. 341, 350, 50 L.Ed. 596.

With reference to the liberty of contract the rule is stated as follows: in 16 C.J.S., Constitutional Law, § 210, p. 1067:

"The liberty to contract, as guaranteed by the various constitutions, includes the right of parties to incorporate into their contracts, otherwise valid, such terms as may be mutually satisfactory to them, the right to mortgage property, the right to fix a price for personal services, and the right to decline to enter into a contract."

In the case of State v. Cromwell, 72 N.D. 565, 9 N.W.2d 914, 920, this court held unconstitutional a statute requiring photographers to take an examination and procure a license in order to follow their occupation. We quote from the opinion:

"The regulatory statute enacted in the exercise of the police powers must be reasonable. Its real purpose must be to protect the public health, morals or general welfare, and it must be reasonably required and suited to attain that purpose. It cannot masquerade as an exercise of the police power and arbitrarily invade personal rights or private property. It cannot disregard the constitutional guaranties."

■ It is necessary that the Statute such as the one under consideration here, in order to be valid, must be aimed at some evil or sinister purpose such as injury to competition, destruction of competition or creation of a monopoly. The Supreme Court of the United States so held in the case of Fair-

mount Creamery Co. v. Minnesota, 274 U.S. 1, 47 S.Ct. 506, 508, 71 L.Ed. 693. The Supreme Court of Minnesota had upheld a statute prohibiting any person engaged in the business of buying milk and cream or butterfat to discriminate between localities by paying a higher price in one locality than in another after making due allowance for the difference in cost of transportation. The Supreme Court of the United States reversed this decision and held the Statute unconstitutional, the court stating:

"As the inhibition of the statute applies irrespective of motive, we have an obvious attempt to destroy plaintiff in error's liberty to enter into normal contracts, long regarded, not only as essential to the freedom of trade and commerce, but also as beneficial to the public."

The court said further:

"The real question comes to this: May the state, in order to prevent some strong buyers of cream from doing things which may tend to monopoly, inhibit plaintiff in error from carrying on its business in the usual way heretofore regarded as both moral and beneficial to the public and not shown now to be accompanied by evil results as ordinary incidents? Former decisions here require a negative answer. We think the inhibition of the statute has no reasonable relation to the anticipated evil-high bidding by some with purpose to monopolize or destroy competition. Looking through form to substance, it clearly and unmistakably infringes private rights, whose exercise does not ordinarily produce evil consequences, but the reverse."

· It is true, of course, that the legislature may, under the police power of the state, enact fair and reasonable regulations governing trade practices employed by those engaged in an industry affected with a public interest; but such regulations must not be arbitrary and discriminatory so as to interfere with legitimate property rights. Such regulations must have a real and substantial relation to some objectionable activity which is detrimental to the general welfare of the public. The governing principle to be followed by legislatures in the enactment of regulatory statutes is stated in Chicago, B. & Q. Ry. v. State of Illinois, supra, as follows:

"If the means employed have no real, substantial relation to public objects which government may legally accomplish,—if they are arbitrary and unreasonable, beyond the necessities of the case,—the judiciary will disregard mere forms, and interfere for the protection of rights injuriously affected by such illegal action."

■ The respondent states in its brief that it "is not involved with the provisions of Section 1, subd. 2, subsecs. a, c, f, and h, as in its business those sections are not violated." Since those provisions are not challenged it is not necessary to determine their validity and we refrain from doing so. This leaves for consideration subsections b, e, d, and g, of Section 1, subd. 2.

■ It is the contention of appellants that the practices prohibited by said subsection restrict competition and tend to create a monopoly. Subsection b, prohibits the wholesaler from furnishing, giving, lending, selling or renting to a retailer any advertising materials or matter except material or matter advertising the wholesaler's own products, providing that not more than one third of the space or cost of the advertising material or matter be used to identify the retailer. This subsection prohibits not only the furnishing of signs or advertising material, but also the renting, lending, or selling on any terms whatsoever any such advertising. The wholesaler cannot under any circumstances furnish advertising material, no matter how reasonable the rate, except within the limitation of the statute. There is no showing in the record that the transactions prohibited by

this section bear any relation to the public health, morals, or general welfare.

Subsection c, prohibits payments by a wholesaler of money, credit, gifts or loans to retailers as rental for the storage or display of dairy products on the premises where they are offered for sale. Under this subsection the products of the wholesaler may be sold by a retailer at his place of business but he cannot accept payment for storage or display of the products of the wholesaler.

Subsection d, prohibits a wholesaler from making loans or underwriting loans to a retailer when the loan is for more than ninety percent of the purchase price; and where a loan is made it cannot be made for more than thirty-six months and must be secured by a chattel mortgage bearing interest at five percent.

It is difficult to see that the trade practices prohibited by subsection d, would stifle competition or tend to create monopolies. It would rather do the opposite. Except for the inhibitions in the statute the wholesaler could extend credit on more liberal terms to a retailer who might need financial assistance and thus enable him to continue in business. Any loan made by a wholesaler to a retailer on the strength of the credit of the retailer or secured by mortgage on any other class of property than the special dairy refrigeration equipment, is illegal under said section. It is not specified in the statute, nor is there any evidence in the record that such a loan bears a relation to any injurious trade practice shown to exist in the dairy industry.

Subdivision g, of said Chapter 303 prohibits wholesalers from giving credit to any retailer in excess of thirty days payable in fifteen days thereafter. This provision clearly is a restriction upon a wholesaler's right to extend credit to a retailer in accordance with legitimate business practices.

It appears that the respondent has numerous existing contracts between itself and retail dealer customers involving the various kinds of transactions, all of which contracts under the provisions of Section 2 of said Chapter 303 are illegal and void if the validity of the statute is sustained.

The trade practices prohibited by subsections b, d, e, and g, of said Chapter 303 are not in themselves objectionable. They are legitimate business transactions between wholesalers and retailers. There are no relevant facts in the record showing that these practices have had a tendency to restrict competition or to create monopolies. Neither is there any evidence in the record that the practices prohibited bear any reasonable relation to any vice or evil affecting the public health, morals, or general welfare.

The provisions of said Chapter 303 challenged by respondent are all-inclusive condemnations of all acts prohibited without specifying that such acts are connected with any unjust discrimination, or with any agreement restricting competition, or creating a monopoly. We think the following statement from the opinion of the Supreme Court of the United States in the case of Tyson & Bros. etc. v. Banton, 273, U.S. 418, 47 S.Ct. 426, 432, 71 L.Ed. 718, is applicable to the issues in the instant case.

"It is not permissible to enact a law which, in effect, spreads an all-inclusive net for the feet of everybody upon the chance that, while the innocent will surely be entangled in its meshes, some wrongdoers also may be caught."

We arrive at the conclusion that subdivisions b, d, e, and g, of Section 1, subd. 2, Chapter 303, 1955 Session Laws of North Dakota, are arbitrary and unreasonable restrictions upon lawful business practices; that no showing has been made that said sections have any reasonable relation to practices restricting competition or creating monopolies in the dairy industry; that the enforcement thereof would result in the impairment of respondent's right of contract and property rights, and, that the statutes challenged are violative of Sections 13, and

16 of the Constitution of the State of North Dakota.

The judgment of the district court held Chapter 303 Session Laws of 1955 unconstitutional in its entirety. Since we have not passed on the validity of certain parts of said Chapter the judgment of the district court is modified to conform to this opinion and as so modified it is affirmed.

GRIMSON, C. J., and JOHNSON, BURKE and MORRIS, JJ., concur.